## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**DORENE LEESON,**
        **Plaintiff,**

    **v.**                          **Civil Action 2:14-cv-335**
                                        **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**
        **Defendant.**

### OPINION AND ORDER

Plaintiff, Dorene Yvonne Leeson, brings this action under 42 U.S.C. §§ 405(g) and

1383(c)(3) for review of a final decision of the Commissioner of Social Security

("Commissioner") denying her applications for social security disability insurance benefits and

supplemental security income.  This matter is before the Court for consideration of Plaintiff's

Amended Statement of Specific Errors (ECF No. 17), the Commissioner's Memorandum in

Opposition (ECF No. 22), Plaintiff's Reply (ECF No. 23), and the administrative record (ECF No.

10).  For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and

**AFFIRMS** the Commissioner's decision.

## I.     BACKGROUND

Plaintiff filed an application for disability insurance benefits on September 8, 2010,

alleging that she has been disabled since July 1, 2008, at age 45.  (R. at 190.)[1]  Plaintiff alleged

disability due to "back injury, diabetes, depression, constant pain, and degenerative disk disease."

(R. at 244.)  Plaintiff's application was denied initially and upon reconsideration.  (R. at 62−83,

---

[1] Plaintiff notes, that she filed an application for supplemental security income on September 9, 2010, alleging that she has been disabled since January 3, 2010 at age 47.  (R. at 192.)  Plaintiff concedes that the date of onset was correctly determined to be July 1, 2008 during the administrative proceedings. (Plaintiff's Amended Statement of Errors, at 6.)  Indeed, Plaintiff testified that her alleged onset date was July 1, 2008.  (R. at 32.)  Thus, contrary to Plaintiff's claims, alleged onset date does not need to be clarified.

84−111.)  Plaintiff sought a *de novo* hearing before an administrative law judge ("ALJ").  (R. at 151.)  ALJ, Charlotte A. Wright, held a video hearing on August 27, 2012, at which Plaintiff was represented by counsel.  (R. at 28−61.)  A vocational expert, Bruce Growick, ("VE") also appeared and testified.  (R. at 52−60.)  On September 25, 2012, the ALJ issued a decision finding that Plaintiff was not disabled.  (R at 9−19.)  The Appeals Council denied Plaintiff's request for review and adopted the ALJ's determination as final.  (R. at 1−3.)  Plaintiff then timely commenced this action.

## II.     PLAINTIFF'S TESTIMONY

Plaintiff testified that she is unable to work right now because she experiences lower back pain that goes into her hip.  (R. at 35.)  Plaintiff further testified that for the last year and a half she has also occasionally experienced pain that shoots down her left leg.  (R. at 47–48.)  Plaintiff stated that she does not, however, know what triggers that shooting pain.  (R. at 47.)  Plaintiff explained that she has good and bad days and that rain sets off her back pain and makes it a bad day.  (R. at 51.)  She stated that she has at least four bad days a week.  (Id.)  On bad days, she wants to "do nothing," and although she tries to make herself comfortable, nothing seems to help.  (R. at 51−52.)  Plaintiff testified that she underwent lower back surgery the year before the hearing but it "has not corrected the situation."  (R. at 35.)

Plaintiff testified that she also has neck problems but explained that they are not as severe as her back problems.  (R. at 48.)  She testified that she experiences pain over her right shoulder when she turns her head to the right and she cannot lift her head to look straight up.  (R. at 48−49.)  Plaintiff stated that she was diagnosed with degenerative disk disease in her neck.  (R. at 49.)  She also stated that she received injections for her neck in the past and had neck surgery in 2008.  (R. at 49, 52.)

Plaintiff testified that she sees her family physician, Dr. Olson, once a month.  (R. at 36−37.)  Plaintiff also testified that she has received treatment for pain for five years— she treated with Dr. Siddiqui for three years and then treated with Dr. Fig for the two years immediately prior to the hearing.  (R. at 36.)  Plaintiff explained that pain medicine eases her pain but does not relieve it.  (R. at 38.)  Plaintiff stated that injections, nerve blocks, and a TENS unit did not help and that the TENS unit made things worse.  (R. at 39−40.)  Plaintiff also stated that she had physical therapy for six weeks about a year and a half before the hearing but that did not work either.  (R. at 39.)  Plaintiff nevertheless acknowledged that that Dr. Fig has reduced her pain medications.  (R. at 36.)

Plaintiff testified that she is currently unable to work at her past jobs because they require her to be on her feet or to sit for extended periods and that causes her problems.  (R. at 51.)  Specifically, Plaintiff testified that her last job as a customer service representative, which she held from August of 2009 until January of 2010, ended because her back issues prevented her from sitting for prolonged periods.  (R. at 34−35.)  Plaintiff further testified that she can lift five pounds; carry five pounds for short distances; sit for 10 minutes; stand for 15 minutes; and walk for 5 minutes.  (R. at 40.)  She further testified that she cannot stoop or crouch and cannot reach over shoulder level without getting sharp pains in her lower back.  (R. at 40−41.)

Plaintiff stated that on an average day she gets up, showers, sits until it hurts to do so, and then walks around.  (R. at 41.)  Plaintiff further stated that she repeats a pattern of sitting and standing. (Id.)  Plaintiff also testified that she has no trouble showering, dressing, or combing her hair.  (R. at 42.)  She testified that she cooks twice a week and does dishes when she has them.  (Id.)  Plaintiff indicated that she visits with family at her house.  (R. at 44.)  Plaintiff explained that she could not, however, mop, vacuum, sweep, or do laundry because laundry requires her to use steps.  (R. at 42.)  Plaintiff further explained that she does not do yard work, lawn work, or gardening.  (R

3

at 43.)  Plaintiff stated that she seldom goes grocery shopping and uses a cart when she does.  (Id.)
Plaintiff also indicated that she drives twice a month, uses a computer once a week, and watches
television although she cannot sit for too long.  (R. at 33, 44.)  Plaintiff also pays her bills via
telephone calls and a debit card.  (R. at 44.)

Plaintiff testified that depression has become an issue since her fiancé passed away around
Christmastime of 2011.  (R. at 45.)  She testified that she does not want to "do a whole lot" and
sleeps all the time.  (Id.)  Plaintiff described going "back and forth" between being awake for one to
two hours and then sleeping for three to four hours.  (R. at 46−47.)  She explained that she does not
want to be social, that being around happy people makes her upset, and that going out reminds her
of her fiancé.  (R. at 46.)  Plaintiff reported seeing a counselor once a week for two months before
the hearing.  (R. at 37.)

### III.    MEDICAL RECORDS

#### A.    Plaintiff's Physical Impairments

#### 1.    Records From Treating Surgeon, Dr. Dixon

Medical records from Dr. Dixon at Columbus Neurosurgical Group reflect that Plaintiff
sought treatment for neck and shoulder pain in November and December of 2007.  (R. at 379–81.)
During that time frame, Dr. Dixon wrote that he reviewed several MRIs of Plaintiff's neck which
demonstrated disk herniation at C6-7 producing stenosis.  (Id.)  Dr. Dixon also wrote that Plaintiff
reported worsening neck pain over the prior two years despite use of medications and a TENS unit.
(R. at 381.)  Dr. Dixon recommended physical therapy in November and cervical injections in
December but discussed surgical options with Plaintiff in case she did not respond to those
measures.  (R. at 382, 379.)

Dr. Nixon's notes reflect that on January 10, 2008, Plaintiff underwent an anterior cervical decompression fusion and fixation because her low neck pain and radiculopathy had been resistant to the more conservative measures.  (R. at 390–92.)  Dr. Dixon's notes generally reflect that the surgery was successful.  In February of 2008, Dr. Dixon examined Plaintiff and noted that her radicular and neck pain was resolved.  (R. at 377.)  He further wrote that Plaintiff was using Hydracodone and Zanaflex, but recommended "titration down off the narcotic medication."  (R. at 377.)  On March 7, 2008, Dr. Dixon wrote that Plaintiff was clear to begin physical therapy and should be titrated down off of Vicodin.  (R. at 375.)  On March 21, 2008, Dr. Dixon wrote that three months after the surgery, Plaintiff's neck pain was "markedly improved;" on March 27, 2008, Dr. Dixon wrote that Plaintiff was "making an excellent recovery following her cervical disk surgery" and that x-rays revealed appropriate alignment and healing.  (R. at 373, 371.)  Nonetheless, during these visits Plaintiff complained of numbness and tingling initially in her right and then in her left arm, numbness and tingling in her right upper extremity, and low back pain.  (R. at 375, 373, 371.)  Dr. Dixon opined that Plaintiff's right arm symptoms were not severe but suspected cubital tunnel syndrome on the left side, degenerative disk disease, and lumbar spinal stenosis.  (R. at 371.)  He also recommended an EMG nerve conduction study of the upper left extremity and an MRI of the lumbar spine.  (Id.)

Dr. Dixon reviewed an MRI of Plaintiff's lumbar spine on March 27, 2008.  (R. at 371.)  He wrote that Plaintiff suffered from moderately severe disk derangement at L4-5 but that adjacent segments appeared "well-spared."  (Id.)  Dr. Dixon noted that Plaintiff was doing physical therapy for her neck and he recommended adding a lumbar spine program to that regimen.  (Id.)  He also recommended a single epidural injection which was performed on April 2, 2008.  (R. at 371, 367.)

Dr. Dixon's notes reflect that the injection was well tolerated but Plaintiff reported no improvement for her back issues at a follow-up visit on April 11, 2008.  (R. at 367.)

Dr. Dixon's notes reflect that Plaintiff subsequently underwent a lumbar decompression and fusion at L4-5 to relieve her back and bilateral leg pain.  (R. at 384, 386–89.)  That surgery was performed April 29, 2008; Plaintiff was discharged May 3, 2008. (R. at 385.)  At the time, Dr. Dixon wrote that the procedure was without incident, Plaintiff did well postoperatively, and her back pain was controlled with oral medication.  (Id.)  On May 12, 2008, Dr. Dixon examined Plaintiff and wrote that her radicular symptoms were "markedly improved," that she had no numbness or tingling, and that she should progress from use of a walker to a cane.  (R. at 365.)

On May 28, 2008, Plaintiff sought treatment from Dr. Dixon after she tripped and fell and experienced increased back pain where the surgical fusion of L4-5 was done.  (R. at 363.)  Dr. Dixon noted that x-rays revealed no apparent damage to the L4-5 fusion construct, there was no change in the position of the screws, rods, or cross connector, and there were excellent signs of bone formation.  (Id.)  Dr. Dixon wrote that he temporarily increased Plaintiff's pain medication and recommended rest and limited activity levels.  (Id.)  On June 6, 2008, Dr. Dixon wrote that Plaintiff had decreased one of her pain medications, Norco, and  that she felt she would be able to titrate herself down further.  He indicated that Plaintiff should titrate down off narcotic pain medication completely.  (R. at 362.)  Dr. Dixon's notes also reflect that Plaintiff requested a return to work date because she felt she was "able to return to some type of desk work in a limited fashion."  (Id.) Dr. Dixon indicated that at Plaintiff's request, he provided a return to work date of June 16, 2008.  (Id.)  He also indicated that he would be discussing Plaintiff's advancement to physical therapy at her next treatment visit.  (Id.)

At a treatment visit on July 11, 2008, Dr. Dixon wrote that Plaintiff had "returned to gainful employment." (R. at 399.) He also wrote that Plaintiff still had back pain but no radicular symptoms and "absolutely no leg pain." (R. at 399.) Dr. Dixon indicated, however, that Plaintiff rated her neck pain as a six on a ten point scale and her shoulder and arm pain as a 7 on a ten point scale. (Id.) Dr. Dixon reviewed x-rays of Plaintiff's lumbar spine and noted persistent scoliosis which she had preoperatively. (Id.) He also noted that the "posterolateral fusion appears to be healing satisfactorily;" there was adequate osseous alignment at L5-S1; bone formation within the interbody prosthesis and anterior; and no progression of disk degeneration to adjacent segments. (Id.) In addition, Dr. Dixon wrote that the cervical fusion at C6-7 "has healed quite nicely." (Id.) He nevertheless noted that Plaintiff was developing "slight anterolisthesis of C5 on C6 with anterior spondylosis," but that on "dynamic films the anterolisthesis of C5 on C6 reduces completely." (Id.) Additionally, he wrote that although there was "degenerative disk changes at the more cephalad segments . . . . [t]he osseous alignment is otherwise well maintained." (Id.) Dr. Dixon further noted that his impression was "C6 radiculitis right upper extremity most likely due to adjacent segment instability C5-6" and "[a]ppropriate mechanical low back pain at three months postoperative lumbosacral fusion." (Id.) Dr. Dixon recommended that Plaintiff further titrate off of Vicodin, prescribed Darvocet with one refill, and advised Plaintiff to consult with her family physician, Dr. Olson, about alternatives medications including anti-inflammatories and muscle relaxers. (R. at 399–400.) He also discussed advancement to physical therapy directed at Plaintiff's lumbar spine, for which she was cleared. (R. at 400.) Dr. Dixon indicated that he also believed that Plaintiff might benefit from cervical traction and postural exercises for her neck pain. (Id.)

### 2.    Records From Evaluating Physician, Dr. Fonkem

On December 22, 2010, Plaintiff was examined by state agency physician, Dr. Fonkem. (R. at 468–70.) Dr. Fonkem wrote that Plaintiff reported experiencing back pain for approximately ten years. (R. at 468.) Dr. Fonkem also wrote that Plaintiff stated that her pain was usually in the low back and radiated to her right leg. (Id.) Dr. Fonkem indicated that Plaintiff reported undergoing surgery for a collapsed disk in 2005 but continuing to experience pain after that procedure. (Id.) Dr. Fonkem also indicated that Plaintiff reported experiencing neck pain for approximately ten years. (Id.)   Nevertheless, upon examination, Plaintiff had only some slight limitation to lateral neck rotation and her neck was otherwise unremarkable. (R. at 469.) Dr. Fonkem also wrote that Plaintiff had 5/5 bilateral strength, normal muscle bulk and tone, and a normal gait. (Id.) He further wrote: "Examination today does not show any limitation of any physical activity.  However, claimant does have a little bit of tenderness in the low back with palpitation." (R. at 470.) Dr. Fonkem noted that Plaintiff smoked a pack of cigarettes every day for the last 25 years. (R. at 469.)

### 3.    Records From Doctor's Hospital on January 30, 2011

On January 11, 2011, Plaintiff presented to the Emergency room at Doctor's Hospital complaining of sudden sharp pains in the lumbar and thoracic regions after falling down several steps. (R. at 484–85.) Emergency room records indicated that Plaintiff could walk but she reported that walking was painful and exacerbated her pain. (Id.) The notes also indicate that Plaintiff had full range of motion, no tenderness in her extremities, and no midline spine tenderness although there was some L-spine tenderness to palpitation. (R. at 484.) The notes state that Plaintiff inquired about prescriptions for pain medicine after indicating that she would be all out of pain medications prescribed for her chronic low back problems and that she was not

scheduled to see her prescriber until February 7, 2011. (R. at 485.) The treating physician agreed to prescribe five tablets of Vicodin, or one additional day of pain medication. (Id.)

### 4. Records From Treating Physician, Dr. Siddiqui

Medical records from Dr. Siddiqui at Dublin Pain Clinic, LLC reflect that Plaintiff received an epidural steroid injection in September of 2010, and a radiofrequency ablation in November of 2010. (R. at 460–61.) Notes from a visit on March 2, 2011, indicate that Plaintiff reported that she would be traveling to Florida for a funeral and wanted to get her pain medication prescriptions filled early. (R. at 519.) The notes also indicate that Plaintiff reported low back pain with occasional pain radiation down her left leg and "a lot" of pain in her right butt cheek. (Id.) Dr. Siddiqui wrote that Plaintiff rated her current pain as a five on a ten point scale leg. (Id.) Dr. Siddiqui also wrote that Plaintiff denied pain in her right leg and lumbar region. (Id.) He noted that Plaintiff was unemployed, but active and that her pain had decreased since a prior visit. (Id.) He further noted that Plaintiff was not compliant with physical therapy. (Id.)

During an examination on May 10, 2011, Dr. Siddiqui wrote that Plaintiff complained about throbbing lower back pain on her left side especially when she lying on that side. (R. at 518.) The notes also indicate that Plaintiff reported going to the ER three times that month and receiving Dilaudid at one of those visits. (Id.)[2] Although Dr. Siddiqui wrote that Plaintiff reported that her pain was an eight on a ten point scale, he nevertheless noted that she remained active and once again wrote that her pain had decreased since her last visit. (Id.) He also noted that she remained non-compliant with physical therapy. (Id.)

---

[2] The record contains treatment notes from visits to the ER room, including a visit on April 2, 2011, at which Plaintiff complained lumbosacral pain, and numbness, tingling and shooting pain in her lower right extremity. (R. at 535–41.) Plaintiff was given a Dilaudid injection. (R. at 537.)

On July 11, 2011, Dr. Siddiqui wrote that Plaintiff appeared hostile and agitated because concerns she had about her medications were not addressed at her previous visit.  (R. at 464.)  The notes state that Plaintiff reported low back pain that radiated to both hips and neck pain that radiated down to both shoulders.  (Id.)  The notes also state that Plaintiff complained about taking Neurontin and Lyrica at that same time, but Dr. Siddiqui reminded her that they had discussed continuing that combination because she reported getting better pain control with it.  (Id.)  The notes also indicate that Plaintiff requested "Lortab 10s" and an alternative drug to Naprosyn.  (Id.)  Dr. Siddiqui wrote that he explained that he had changed her to a slow acting narcotic patch and wanted to keep Lortab for "break through pain."  (Id.)  The notes state that Plaintiff indicated that she did not want to use the patch and wanted to go back to her previous Lortab prescription.  (Id.)  Dr. Siddiqui wrote that he determined to keep her on Neurontin and Lyrica.  (Id.)  He also wrote that Plaintiff was active, her pain had decreased since the last visit, and that the effectiveness of the pain medications was good.  (Id.)  He noted that she remained non-compliant with physical therapy.  (Id.)

### 5.    Records From State Agency Reviewing Physician, Dr. Warren

On June 20, 2011, state agency reviewer Dr. Warren reviewed Plaintiff's file and opined that Plaintiff could occasionally lift or carry 20 pounds and frequently lift or carry ten pounds; could stand six hours in an eight hour work day; sit six hours in an eight hour work day; could occasionally climb ladders, ropes, or scaffolds, stoop, crouch, or crawl; and could frequently climb stairs.  (R. at 105–106.)

### 6.    Records From Treating Physician, Dr. Udelman

On October 14, 2011, Plaintiff underwent a right far lateral L5-S1 microscopic lumbar laminectomy and discectomy.  (R. at 817–26.)  The records indicate that the procedure, performed

by Dr. Udelman, was done after MRI and CT scans revealed disk protrusion at that level.  (Id.)
On October 22, 2011, Plaintiff was admitted to the hospital after her surgical incision became
seriously infected.  (R. at 783–93.)  Plaintiff was released October 28, 2011 but re-admitted on
November 6, 2011 when an MRI revealed a posterior right paraspinal abscess at L5-S1.  (R. at
783, 747.)  Surgical drainage was performed and Plaintiff was released November 14, 2011.  (Id.)
Throughout, Plaintiff was prescribed antibiotics and pain medications.  (Id.)  On November 12,
2011, Dr. Uselman wrote that one of his impressions was that Plaintiff had opioid tolerance and
dependence.  (R. at 756.)  Dr. Udelman also recommended that Plaintiff cease smoking but
Plaintiff was unwilling to quit and declined a nicotine substitute.  (R. at 752.)

       **7.**      **Records From Treating Physician, Dr. Figg**

Plaintiff first sought pain management treatment from Dr. Figg's office both before and
after the October 14, 2011 laminectomy and discectomy performed by Dr. Udelman and her
ensuing infection.  At a visit on June 11, 2011, Dr. Figg wrote that Plaintiff reported experiencing
chronic low back and neck pain.  (R. at 680.)  Dr. Figg also wrote that Plaintiff described pain in
the mid and low back and hip but did not describe radicular symptoms aside from occasional
radiating pain in her right upper extremity.  (Id.)  The notes state that Plaintiff described her pain
as constant and aching, currently at a level of nine out of ten but averaging a seven out of ten over
the last few months, and that her pain was made worse by activity.  (Id.)  The notes further state
that Plaintiff received pain treatment from Dr. Siddiqui but she was unhappy because Dr.
Siddiqiui's office was "pushing epidural steroids on her when they don't seem to be giving her any
long-term relief."  (Id.)  Dr. Figg wrote that "[essentially, [Plaintiff] is tired of waiting in the
waiting room for a long time for Dr. Siddiqui and she doesn't feel as if she is making any
progress."  Upon examination, Dr. Figg wrote that Plaintiff's strength was 5/5 and that her

sensations and reflexes were intact.  (R. at 681.)  He also noted that she had significant paraspinal muscular tenderness and spasm throughout the lumbar and thoracic region.  (Id.)  Dr. Figg indicated that he wanted Plaintiff to speak with Dr. Siddiqui about her concerns.  (Id.)  He further indicated that transfer of care would be appropriate if that conversation did not address her concerns.  (R. at 682.)  Dr. Figg also wrote that the medications Plaintiff had received from Dr. Siddiqui seemed appropriate and that he would not necessarily recommend ongoing epidural steroid injections unless Plaintiff developed radicular symptoms.  (Id.)  On the other hand, he wrote that Plaintiff might benefit from radiofrequency ablation above the level of her lumbar fusion.  (Id.)

On July 28, 2011, Plaintiff followed up with Dr. Figg after deciding to transfer her care to him from Dr. Siddiqui.  (R. at 623.)  Dr. Figg wrote that Plaintiff reported that her pain was nine out of ten because she was all out of her pain medications.  (Id.)  Dr. Figg also wrote that Plaintiff brought a list of medications with her and that they discussed that some of them were repetitive. (Id.)  Upon examination, Dr. Figg noted that Plaintiff had some bilateral pain with range of motion in the shoulders, and paraspinal tenderness with palpitation that was exacerbated by extension, twisting, and flexion of the lumbar spine.  (R. at 624.)  Dr. Figg also noted that Plaintiff walked without difficulty, and that her strength, sensation, and reflexes were intact.  (Id.)

From August through December of 2011, Plaintiff saw a certified nurse practitioner in Dr. Figg's office.  (R. at 625–32, 690–700.)  The records indicate that on August 25, 2011, Plaintiff complained about pain in her right hip and described numbness and tingling in her arms and in the fifth digit of her left hand.  (R. at 525.)  The records also indicate that the nurse practitioner and Dr. Figg recommended that Plaintiff undergo an EMG for her left upper extremity.  (R. at 626.) The records further indicate that Plaintiff reported that she needed refills of medications prescribed

by other providers, but she could not remember the strength of those other medications. (Id.) The records state that Plaintiff was instructed to go home, check her medication bottles, and then contact Dr. Figg's office about those prescriptions. (Id.) The nurse practitioner indicated that she would discuss Plaintiff's other medications with Dr. Figg after Plaintiff called the office. (Id.)

Records dated September 23, 2011 indicate that an EMG revealed findings consistent with left cubital tunnel syndrome. (R. at 629-30.) Those records also state that Plaintiff complained about pain across the low back and into the hip, sharp shooting or stabbing pain in the right hip, numbness and tingling in the left shoulder and hand, and numbness and tingling in the right hip and leg. (R. at 629.) The records also state that Plaintiff declined epidural steroid injections for the radicular pain in her right lower extremity because Plaintiff reported that she did not have success with epidural steroid injections in the past. (R. at 630.) The records also reflect that Plaintiff was referred to Dr. Udelman. (Id.)

Plaintiff sought treatment from Dr. Figg's office again on October 20, 2011, six days after Dr. Udelman performed her L5-S1 microscopic lumbar laminectomy and discectomy on October 14, 2011. (R. at 686.) The records reflect that Plaintiff described experiencing intense pain and significant drainage. (Id.) Nonetheless, the records state that at that time, Plaintiff's incision appeared "well approximated," had moderate drainage, and Plaintiff had no fever. (Id.) The records further indicate that Plaintiff requested a prescription for soma, but the nurse practitioner explained that the office did not prescribe that drug. (Id.)

Plaintiff subsequently sought treatment from Dr. Figg's office after she was treated by Dr. Udelman for the infection and abscess of the incision for her October 14, 2011 laminectomy and discectomy. (R. at 690.) The records state that during that during a November 15, 2011 visit, Plaintiff asked if Dr. Figg's office could obtain prior authorizations for prescriptions for Oxycontin

and Oxycodone prescribed to her by Dr. Udelman. (Id.) The records indicate that Plaintiff was referred to Dr. Udelman's office for those prior authorizations. (Id.) Records dated December 6, 2011 state that Plaintiff reported numbness in her left hip, and muscle spasms in her low back and into her legs. (R. at 693.) Those records also state that Plaintiff reported taking two muscle relaxers every four hours. (Id.) The nurse practitioner wrote that she explained that this was an "awful lot of Robaxin" and that she did not recommend that Plaintiff take it that way. (Id.) The records also state that Plaintiff asked for a prescription of Robaxin. (R. at 693–94.) The nurse practitioner wrote that Plaintiff was prescribed Lyrica, Vicodin, and a trial of Zanaflex. (R. at 694.) Records dated December 21, 2011 state that Plaintiff admitted to taking more Percocet than she was prescribed. (R. at 698.) The records also state that Plaintiff said she did so only because her pain was so significant. (Id.) The records indicate that Plaintiff was counseled against such overuse, particularly in light of risks posed by her other medications. (R. at 699.) Plaintiff was prescribed methadone and Percocet. (Id.)

Plaintiff was examined by Dr. Figg on January 4, 2012. (R. at 703.) Dr. Figg wrote that Plaintiff indicated that her pharmacy refused to fill her prescription for Percocet because she had overused it, even though Dr. Figg's office had authorized the prescription. (Id.) Accordingly, Dr. Figg noted that Plaintiff had been without Percocet for several weeks. (Id.) Dr. Figg wrote that despite this Plaintiff "looks a little better" and that the methadone seemed to be helping. (Id.) Dr. Figg also wrote that Plaintiff described her pain as a six on a ten point scale with increased pain with lumbar extension. (R. at 703–704.) He noted that she walked without difficulty despite demonstrating an antalgic gait favoring the left lower extremity. (Id.)

Plaintiff was examined by Dr. Figg again on February 13, 2012. (R. at 708.) Dr. Figg wrote that Plaintiff was making slow but steady progress after recovering from her fusion surgery

and infection but noted that there had been "untoward" behavior in Plaintiff's case including significant overuse of opioids and dishonesty about prescription needs. (Id.) Dr. Figg explained that he reviewed an OARS report and that it revealed discrepancies. (Id.) Specifically, Dr. Figg wrote that on January 4, 2012, Plaintiff told him she could not fill the Percocet prescription he had written on December 21, 2011. (Id.) Dr. Figg noted, however, that the OARS report indicated that Plaintiff had actually filled a prescription for 90 Percocet on January 3, 2012. (Id.) Dr. Figg wrote that Plaintiff told him that she believed that her fiancé filled that prescription without her knowledge. (Id.) Dr. Figg also wrote, however, that Plaintiff also told him that her fiancé had passed away about ten days before that prescription was filled. (Id.) Dr. Figg wrote that Plaintiff needed to submit to a urine test for drug screening. (R. at 709.) Dr. Figg also wrote that Plaintiff was able to walk without difficulty, her strength was intact and her sensation was within normal limits. (Id.)

Plaintiff was examined by a nurse practitioner in Dr. Figg's office during monthly visits that occurred from March until July of 2012. (R. at 713–728.) The records indicate that on March 13, 2012, Plaintiff complained that one Percocet a day did not seem to be enough. (R. at 713.) The records state that Plaintiff's gait was nevertheless stronger and steadier than at prior visits. (Id.) The records also state that Dr. Figg's office believed it was time to begin weaning Plaintiff from her medications and her prescriptions were altered. (R. at 714.) The records indicate that Plaintiff verbalized that she was unsure how she was going to keep her pain under control if her medications were reduced. (Id.)

On April 12, 2012, the nurse practitioner wrote that Plaintiff brought her two year old grandchild with her to her appointment. (R. at 717.) The records also state that Plaintiff appeared stronger than at previous visits. (R. at 718.) On May 10, 2012, the notes indicate that Plaintiff

again brought her grandchild to her appointment.  (R. at 721.)  The notes also indicate that Plaintiff

presented with a brace because of an ulnar transposition done by Dr. Udelman on April 13, 2012.

(R. at 721.)  The records state that Plaintiff reported that Dr. Udelman prescribed her post-

operative Percocet and that she was wondering if Dr. Figg would consider taking over that

prescription.  (Id.)  The records also state that Dr. Figg's office believed Plaintiff should contact

Dr. Udelman's office about post-operative pain medications.  (R. at 722.)  On June 7, 2012, the

nurse practitioner wrote that Plaintiff indicated that her neck pain was worse but that her low back

pain was improving.  (R. at 725.)  The nurse practitioner also wrote that she explained to Plaintiff

that Dr. Figg believed it was time to aggressively wean Plaintiff from her opioid medications.  (R.

at 724.)  Records dated July 6, 2012 indicate that Plaintiff complained of low back and hip pain.

(R. at 727.)  Those records also state that Plaintiff's methadone was discontinued but she was

prescribed an additional Percocet per day to make up for that change. (Id.)

### 8.    Records From ER Visit on May 23, 2012

The record contains treatment notes from a visit to the Emergency Room at Doctor's

Hospital on May, 23, 2012.  (R. at 656–70.)  Those notes state that Plaintiff described shooting and

radiating low back pain.  (R. at 658.)  The notes also state that Plaintiff reported that her pain

might be related to doing yard work for the last couple days.  (R. at 657.)  Plaintiff was prescribed

Percocet and discharged.  (R. at 659.)

### 9.    Records From Treating Physician, Dr. Olson

On August 24, 2012, Plaintiff's primary care physician completed a Medical Source

Statement assessing Plaintiff's ability to perform physical activities.  (R. at 830–835.)  Dr. Olson

opined that Plaintiff could occasionally lift or carry up to 10 pounds but could never lift or carry

more; could occasionally handle, finger, feel, push, or pull with the right but never the left hand;

could occasionally reach in directions other than overhead with the right but not the left hand; could never reach overhead with either hand; could occasionally operate foot controls with either foot; could sit, stand, or walk for one hour at a time without interruption; could sit, stand, or walk two hours in an eight hour work day; must alternate between siting and standing; could never climb stairs, ramps, ladders, or scaffolds; and could never balance, stoop, kneel, crouch, or crawl. (R. at 833.)

### B. Plaintiff's Mental Impairments

#### 1. Records From Evaluating Psychologist, Dr. Donaldson

Plaintiff was examined by state agency examiner, Dr. Donaldson on January 4, 2011. (R. at 476–79.) Dr. Donaldson wrote that Plaintiff's affect was flat and her mood anxious but she was oriented to person, time, and place and appeared to become more comfortable as the interview progressed. (R. at 477–78.) Dr. Donaldson diagnosed Plaintiff with an adjustment disorder not otherwise specified. (R. at 479.) Dr. Donaldson opined that Plaintiff's ability to understand, remember, and carry out one or to step tasks did not appear to be impaired. (Id.) He also opined that Plaintiff may have some limitations but that all such limitations were mild. (Id.) Specifically, Dr. Donaldson opined that Plaintiff's ability to perform repetitive tasks did not appear to be limited although her motivation levels might be mildly impaired. (Id.) He further opined that Plaintiff's ability to attend to relevant stimuli might be mildly impeded; that her ability to relate to supervisors and coworkers appeared mildly limited; and that Plaintiff's ability to withstand the stress and pressures associated with day-to-day work activity appeared mildly limited. (Id.)

#### 2. Records From State Agency Reviewer, Dr. Warren

On June 8, 2011, state agency reviewer, Dr. Warren reviewed Plaintiff's file. (R. at 104.) Dr. Warren opined that Plaintiff only had mild restrictions with regard to her activities of daily

living; maintaining social functioning; maintaining concentration, persistence, and pace; and had

no episodes of decompensation.  (Id.)

## IV.    THE ADMINISTRATIVE DECISION

On September 25, 2012, the ALJ issued her decision.  (R. at 9−19.)  The ALJ found that

Plaintiff met the insured status requirement of the Social Security Act through December 31, 2015.

(R. at 29.)  At step one of the sequential evaluation process[3], the ALJ determined that Plaintiff had

not engaged in substantially gainful activity since the alleged onset date of July 1, 2008.  (R. at

11.)[4]  The ALJ also determined that Plaintiff has the following impairments that are severe:

degenerative disk disease; cubital tunnel syndrome; and scoliosis.  (R. at 11.)  She further found

that Plaintiff does not have an impairment or combination of impairments that met or medically

---

[3] Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence.  See 20 C.F.R. § 416.920(a)(4).  Although a dispositive
finding at any step terminates the ALJ's review, see Colvin v. Barnhart, 475 F.3d 727, 730 (6th
Cir. 2007), if fully considered, the sequential review considers and answers five questions:

> 1. Is the claimant engaged in substantial gainful activity?
> 2. Does the claimant suffer from one or more severe impairments?
> 3. Do the claimant's severe impairments, alone or in combination, meet or equal the
> criteria of an impairment set forth in the Commissioner's Listing of Impairments,
> 20 C.F.R. Subpart P, Appendix 1?
> 4. Considering the claimant's residual functional capacity, can the claimant perform
> his or her past relevant work?
> 5. Considering the claimant's age, education, past work experience, and residual
> functional capacity, can the claimant perform other work available in the national
> economy?

See 20 C.F.R. § 416.920(a)(4); see also Henley v. Astrue, 573 F.3d 263, 264 (6th Cir.2009); Foster
v. Halter, 279 F.3d 348, 354 (6th Cir. 2001).

[4] Plaintiff correctly points out that the ALJ noted that Plaintiff continued to work until January of
2010— eighteen months after the alleged onset date of July 1, 2008.  (Plaintiff's Amended
Statement of Errors, at 9.)  The ALJ also noted that Plaintiff earned $14,733 in 2009 and $1,564 in
2010.  (R. at 11.)  Accordingly, the ALJ concluded that Plaintiff likely met the threshold for
substantial gainful activity during at least some portion of her alleged disability period.  (Id.)  The
ALJ nevertheless decided to proceed with the sequential evaluation of Plaintiff's claims for the
periods during which substantial earnings were not reported.  (Id.)  Thus contrary to Plaintiff's
assertions, clarification of substantial gainful income is not required.

equaled one of the listed impairments. (R. at 13.) At step four of the sequential process, the ALJ

set forth Plaintiff's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that Plaintiff is able to occasionally climb stairs, stoop, kneel, crouch, and crawl, but is unable to climb ladders, ropes, or scaffolds.

(R. at 13.) In reaching this RFC, the ALJ noted that the RFC was based in large part upon the

medical opinions of state agency reviewers Drs. Lewis and Warren. (R. at 17.) The ALJ

explained that those opinions were assigned great weight because they were consistent with the

remainder of the medical records and allowed for "symptom interference." (Id.) The ALJ also

assigned great weight to the opinions of examining psychologist Dr. Donaldson and examining

physician Dr. Fonkem to the extent their opinions were consistent with her RFC finding. (R. at

17−18.) The ALJ explained that these opinions were weighted in this manner because they were

generally consistent with the medical evidence of record. (R. at 18.) In contrast, the ALJ assigned

minimal weight to the opinion of treating physician, Dr. Olson, because Dr. Olson appeared to rely

upon Plaintiff's self-reports instead of objective findings and because his opinion was not

consistent with the remainder of the medical record. (R. at 17.) At step four, relying upon

evidence from the VE, the ALJ also found that Plaintiff could perform her past relevant work. (R.

at 18.) Accordingly, the ALJ determined that Plaintiff was not disabled. (R. at 18−19.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. §

405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.     ANALYSIS

Plaintiff raises several assignments of errors. First, Plaintiff asserts that the ALJ erred when assessing and weighing medical opinion evidence from treating physician, Dr. Olson, and from state agency examiner, Dr. Donaldson. Second, Plaintiff asserts that the ALJ erred by failing to make "function by function" findings about Plaintiff's past work when determining that Plaintiff could perform her past work.

A.      **The ALJ Properly Assessed Medical Opinion Evidence**

Plaintiff asserts that the ALJ did not provide good reasons for assigning minimal weight to the opinion from Plaintiff's treating physician, Dr. Olson.  Plaintiff also asserts that the ALJ erred by "failing to mention" several statements found in the report written by state agency examiner, Dr. Donaldson.  The Court finds that these contentions lack merit.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c). The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(2).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique prospective to the medical evidence that cannot be obtained from the objective medical filings alone . . . ." 20 C.F.R. §416.927(d)(2).  If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight."  20 C.F.R. § 404.1527(d)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors-namely, the length of the treatment
> relationship and the frequency of examination, the nature and extent of the
> treatment relationship, supportability of the opinion, consistency of the opinion

with the record as a whole, and the specialization of the treating source-in
determining what weight to give the opinion.

*Id*.  Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination
or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. §
416.927(c)(2).  Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to
any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion
and the reasons for that weight."  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir.
2010) (internal quotation omitted).  The United States Court of Appeals for the Sixth Circuit has
stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the
> disposition of their cases," particularly in situations where a claimant knows that his
> physician has deemed him disabled and therefore "might be especially bewildered
> when told by an administrative bureaucracy that she is not, unless some reason for the
> agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The
> requirement also ensures that the ALJ applies the treating physician rule and permits
> meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362
> F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important when
the treating physician has diagnosed the claimant as disabled."  *Germany-Johnson v. Comm'r of
Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).  There is no
requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the
written decision.  *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir.
2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly
address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion
evidence within the written decision).

Regardless of the source of a medical opinion, in weighing the opinion, the ALJ must apply
the factors set forth in 20 C.F.R. § 416.927(c), including the examining and treatment relationship,

supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the source.  In addition, the regulations provide that where, as here, the ALJ does not assign controlling weight to the claimant's treating physician, he or she must explain the weight assigned to the opinions of the medical sources:

> Unless a treating source's opinion is given controlling weight, he administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge must do for any other opinions from treating sources, non-treating sources, and other non-examining sources who do not work for us.

20 C.F.R. § 416.927(e)(2)(ii).  Where an ALJ's opinion satisfies the goal of § 416.927 and is otherwise supported by substantial evidence, the failure to explicitly provide the weight assigned is harmless.  *See, e.g.*, *Pasco v. Comm'r of Soc. Sec.,* 137 F. App'x 828, 839 (6th Cir. 2005) (harmless error where the ALJ failed to mention or weigh the report of consultative neurologist who only evaluated plaintiff once and was not a treating source); *Dykes v. Barnhart*, 112 F. App'x 463, 467–69 (6th Cir. 2004) (failure to discuss or weigh opinion of consultative examiner was harmless error); *cf. Friend*, 375 F. App'x at 551 (explaining that the treating physician rule "is not a procrustean bed, requiring an arbitrary conformity at all times. If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.").

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity.  20 C.F.R. § 404.1527(d).  Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance.  20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

### 1. Treating Physician, Dr. Olson

The Court finds that the ALJ did not err by failing to provide good reasons for discounting

Dr. Olson's opinion.  The ALJ discussed Dr. Olson's opinion at length.  She wrote:

> Dr. Olson, [Plaintiff's] treating family practitioner, submitted a medical source statement in August of 2012 . . . .  He opined that she would be capable of sitting standing or walking up to two hours, occasionally lifting up to ten pounds, had significant manipulative limitations status post surgery, had foot limitations, was unable to perform any postural activity, and had environmental restrictions including hazards, vibration . . . .  It appears that Dr. Olson's opinion may be based upon [Plaintiff's] self-report as opposed to objective findings.  Significantly, [Plaintiff] demonstrated steady improvement in strength and mobility between February and July of 2012, and was even able to yard work in May of 2012 . . . .  The possibility exists that a doctor may express an opinion in an effort to assist a patient with whom he sympathizes for various reasons.  Notably, it is also possible that a doctor will provide supportive notes or reports in order to satisfy patient requests and avoid unnecessary doctor/patient tension.  While it is difficult to confirm such situations when they occur, they appear to be more likely when the physician opinion in question departs substantially from the remainder of the medical record, as is seen in the present case.  As Dr. Olson's opinion is inconsistent with the remainder of the medical evidence, the undersigned gives this opinion minimal weight.

(R. at 17) (internal citations omitted).

The ALJ thus explicitly provided several reasons for declining to give Dr. Olson's

opinion controlling weight.  First, the ALJ stated that he discredited Dr. Olson's opinion

because it is inconsistent with the remainder of the record evidence.  This is a good reason.  *See*

20 C.F.R. § 404.1527(c)(4) (identifying consistency with the record as a whole as a relevant

consideration when deciding the weight to give a medical opinion).  Moreover, substantial

evidence supports this determination.  The ALJ wrote elsewhere:

> The record reveals that the [Plaintiff] failed to follow –up on recommendations made by her treating physicians, suggesting that her symptoms may not have been as serious as alleged.  Specifically, the [Plaintiff] has continued to smoke cigarettes despite several infusion surgeries, and declined recommended steroid injections . . . Following an initial period of postoperative setbacks, the [Plaintiff] has demonstrated progressive improvement in strength, gait, and ability between February and July of 2012 . . . .  Based upon her recovery, the [Plaintiff's] treating

> physician has been aggressively weaning her pain medication since Spring 2012 . . .
> The [Plaintiff's] conservative, with evidence of improvement with treatment,
> suggests that her symptoms may not be as serious as has been alleged in connection
> with this application and appeal.

(R. at 16-17.)  Indeed, Dr. Olson's opinion that Plaintiff had several extreme limitations also

conflicts with the opinion from state agency examiner, Dr. Fonkem, who opined that Plaintiff

had no physical limitations.  (R. at 470.)  Dr. Olson's opinion also generally conflicts with the

opinion from state agency reviewer, Dr. Lewis, who opined that Plaintiff had fewer exertional

and postural limitations than those described in Dr. Olson's opinion.  (R. at 830-35, 105–107.)

Thus, the ALJ's decision to discount Dr. Olson's opinion for this reason is supported by

substantial evidence.

Second, the ALJ discounted Dr. Olson's opinion because he found it was heavily based

on Plaintiff's self-reports instead of objective findings— self-reports that the ALJ found not

entirely credible.  This, too, is a good reason.  *See Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d

269, 273–74 (6th Cir. 2010) (concluding that the ALJ did not err in rejecting a medical opinion

based on the claimant's subjective complaints, which were not supported by objective medical

evidence); *see also* 20 C.F.R. § 404.1527(d)(3).  Although it appears that Dr. Olson may have

had access to the results of Plaintiff's MRIs and other diagnostic tests, the record does not

contain notes from Dr. Olson discussing or analyzing those tests.  Nor does the form he filled

out refer to any of those diagnostics.  (R. at 830–35.)  Instead, the form lists Plaintiff's "arm

pain, lumbar spasms and pain, parasthesias legs, unstable, antalgic gait."  (R. at 831.)

Substantial evidence also supports the ALJ's good reason for discounting Dr. Olson's

opinion because it was based mainly on self-reports and not objective findings.   The record

confirms that the diagnostic testing, including a lumbar MRI, mild scoliosis, as well as a disc

bulge, degenerative disk disease, endplate osteophytes, and foraminal narrowing at L4-5.  A

follow-up MRI from April 2009 demonstrated postoperative changes in this lumbar area without significant canal or foraminal stenosis. Plaintiff's most recent imaging studies, obtained in November of 2011, revealed a postoperative infection and abscess at L5-S1, but with only mild multilevel degenerative changes and no central canal stenosis. As to her cubital tunnel syndrome, an EMG conducted in August of 2011noted left ulnar neuropathy, consistent with left cubital syndrome, but without evidence of median neuropathy, radiculopathy, plexopathy, or generalized polyneuropathy. These diagnostic and imaging studies do not demonstrate significant abnormalities and instead identify only relatively stable degenerative disk disease without significant stenosis or impingement, and left-sided cubital tunnel syndrome.

Last, the ALJ surmised that Dr. Olson may have formed his opinion because he possibly sympathized with Plaintiff or acquiesced to her demands in order to avoid tension in their doctor patient relationship. (R. at 17.) Although the ALJ stated that it was difficult to confirm the presence of such motives, she noted that they are more likely when an opinion runs substantially counter to the rest of the record evidence such as in this case. (Id.) Other circuits have observed that a patient's treating physician "may want to do a favor for a friend and a client" and thus might be too quick to find that a patient has a disability. *Books v. Chater,* 91 F.3d 972, 979 (7th Cir.1996) (quoting *Reynolds v. Bowen,* 844 F.2d 451, 45 (7th Cir.1988)). The Sixth Circuit has faulted an ALJ for rejecting a treating physician's opinion solely because the ALJ found that the physician's motives were suspect, but the Court has not prohibited an ALJ from examining a treating physician's motives. *Yates v. Colvin,* 940 F.Supp.2d 664, 676 (S.D. Ohio, 2013) (citing *Blakeley v. Comm'r of Soc. Sec.,* 581, F.3d 399, 408 (6th Cir. 2009)). Here, the possibility that Dr. Olson may have been motivated by sympathy or a desire to avoid

tension was one of three reasons the ALJ explicitly gave for assigning Dr. Olson's opinion minimal weight.  As such, this was a proper consideration.

In sum, the Court finds that the ALJ gave good reasons for assigning less than controlling weight to Dr. Olson's opinion.  The ALJ clearly considered the supportability and consistency of Dr. Olson's opinion and reasonably found it lacking.   Substantial evidence supports the ALJ's assessment of the weight to afford Dr. Olson's opinion.

### 2.  State Agency Examiner, Dr. Donaldson

The Court also finds that the ALJ did not err when analyzing the opinion of the state agency examiner, Dr. Donaldson, who assessed Plaintiff's psychological impairments.  Plaintiff essentially asserts that the ALJ erred by "failing to mention" portions of Dr. Donaldson's report.  Specifically, Plaintiff contends that the ALJ should have included in the RFC that she was limited to work involving one to two-step tasks and repetitive instructions based on the opinion of examining psychologist Dr. Donaldson.  This argument fails, however, because Dr. Donaldson opined that Plaintiff's "ability to understand, remember, and carry out one- or two- step job instructions does not appear to be impaired" and that Plaintiff's "ability to perform repetitive tasks does not appear to be limited."  (R. at 479.)   Nevertheless, Plaintiff contends that this statement means that Dr. Donaldson opined that Plaintiff was limited to one and two step tasks and to repetitive work.  (Plaintiff's Amended Statement of Errors, at 10.)  Plaintiff further asserts that the ALJ failed to "give the required explanation for not including those mental limitations in the RFC finding and in the hypothetical to the vocational expert."  (Id.)

Even accepting Plaintiff's construction of Dr. Donaldson's opinion, although it is true that, "[a]n ALJ's failure to consider an entire line of evidence falls below the minimal level of articulation required," *Williamson v. Comm'r of Soc. Sec.*, No. 2:12-cv-244, 2013 WL 394572, *3

(S.D. Ohio Jan. 31, 2013) (quoting *Diaz v. Chater,* 55 F.3d 300, 307 (7th Cir. 1995)); at the same

time "an ALJ is not required to discuss every piece of . . . evidence. . . ."  *Karger v. Comm'r of*

*Soc. Sec.,* 414 F. App'x 739, 753 (6th Cir. Feb. 10, 2011).  As the Court of Appeals stated

in *Kornecky v. Comm'r of Social Security,* 167 F. App'x 496, 507–08 (6th Cir. Feb. 9, 2006), "it is

well settled that '[a]n ALJ can consider all the evidence without directly addressing in his written

decision every piece of evidence submitted by a party,' " *quoting Loral Defense Systems–Akron v.*

*NLRB,* 200 F.3d 436, 453 (6th Cir.1999), and "an ALJ's failure to cite specific evidence does not

indicate that it was not considered." *Craig v. Apfel,* 212 F.3d 433, 436 (8th Cir. 2000).  Stated

differently, and as this Court has held, "there is a distinction between what an ALJ must consider

and what an ALJ must cite to in a written decision." *Swartz v. Comm'r of Soc. Sec.*, No. 1:10-cv-

605, 2011 WL 4571877, *7 (S.D. Ohio Aug. 18, 2011), *adopted and affirmed* 2011 WL 4571873

(S.D. Ohio Sept. 30, 2011).

 In this case, it is clear that the ALJ considered and analyzed Dr. Donaldson's opinion.  The

ALJ wrote: "The undersigned assigns great weight to the [opinion] of Dr. Donaldson . . . the

psychological . . . consultative [examiner] from the Disability Determination Service . . . . Dr.

Donaldson opined that [Plaintiff] suffered mild limitations in her ability to attend to relevant

stimuli, relate to others, and handle the stressors of work. . . . The undersigned finds that [this

assessment is] generally consistent with the weight of the medical evidence of record and has

given [this opinion] great weight to the extent [it is] consistent with the established residual

functional capacity finding. . . .  (R. at 17–18.)

That discussion is adequate in this case.  It illustrates that the ALJ specifically considered

one of the required regulatory factors, consistency, found the opinion generally consistent with the

remainder of the record evidence, and indicated that she did not adopt portions of Dr. Donaldson's

opinions that were inconsistent with the remainder of the record evidence or her RFC

determination. Again, there is substantial record evidence to support that finding, including the

opinion from state agency reviewer Dr. Warren, who opined that Plaintiff had only mild

restrictions with regard to maintaining concentration, persistence, and pace. (R. at 104.) The

ALJ's failure to cite to the specific portions of Dr. Donaldson's report described by Plaintiff does

not constitute reversible error. *See Severance v. Comm'r of Soc. Sec.*, No. 1:14-cv-91, 2015 WL

5009362, *6–*7 (W.D. Mich. Aug. 20, 2015) (finding that an ALJ did not err by failing to mention

a portion of an opinion provided by a consultative psychologist where it was clear that the ALJ

considered the entire report).

**B.      The ALJ Did Not Err By Failing to Make a Function by Function Findings About
          Plaintiff's Ability to Perform Her Past Relevant Work**

Plaintiff also contends that the ALJ erred when assessing Plaintiff's ability to perform her

past work at step four of the sequential analysis. The Court finds that this contention lacks merit.

At step four, claimants have the burden of showing that they can no longer perform their

past relevant work. 20 C.F.R. §§ 404.1520(e) and 416.920(e). Once they have shown this, the

burden at step five shifts to the Secretary to show that, taking into account a claimant's age,

education, and vocational background, she can perform any substantial gainful work in the national

economy. 20 C.F.R. §§ 404.1520(f) and 416.920(f). Although the burden of proof lies with the

claimant at step four, the ALJ still has a duty to make the requisite factual findings to support his

or her conclusion. *See* 20 C.F.R. §§404.1571 and 416.971; 404.1574 and 416.974; 404.1564 and

416.965. This is done by comparing the claimant's "residual functional capacity and the physical

and mental demands" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(e) and

416.920(e). After comparing these two items, a claimant must be able to perform: 1) The actual

functional demands and job duties of a particular past relevant job; or 2) The functional demands

and job duties of the occupation as generally required by employers throughout the national economy. Soc. Sec. Rul. No. 82−61, 1982 WL 31386 at *1 (Soc. Sec. Admin., 1982) ("SSR 82−61").

In this case, the ALJ found that Plaintiff can perform her past relevant work as it is generally performed in the national economy. (R. at 18.) Substantial evidence supports this determination. The VE testified at the administrative hearing that Plaintiff's past relevant work was as a customer service representative, which is generally considered sedentary and semi-skilled; a cashier in retail services, which is generally considered light[5] and low semi-skilled; and a network analyst, which is generally considered sedentary and high semi-skilled. (R. at 54.) The VE further testified that a hypothetical person with Plaintiff's RFC and Plaintiff's past relevant work experience could perform this past work. (R. at 54−55.) The ALJ relied upon this testimony, and determined that when, "comparing [Plaintiff's] residual functional capacity with the physical and metal demands of this work . . . [Plaintiff] is able to perform it as generally performed" and noted that this conclusion was "supported by vocational expert testimony at the hearing." (R. at 18.) The VE's testimony constitutes substantial evidence to support the ALJ's step four determination that plaintiff can perform her past relevant work as it is generally performed. *See* 20 C.F.R. § 404.1560(b)(2) (a VE "may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy").

---

[5] Although the VE testified that Plaintiff's past relevant work as a cashier in retail services was generally considered light, the ALJ mistakenly wrote that this position was sedentary. (R. at 54, 18.) The VE nevertheless testified that a person with Plaintiff's work history and Plaintiff's RFC, a limited range of light work, could perform this position. (R. at 54−55.) Accordingly, the ALJ's mistaken quotation of the VE's testimony did not affect the ALJ's determination and any error in this regard is clearly harmless.

Consequently, Plaintiff has not met her burden of proving she is unable to perform her past relevant work.

Plaintiff nevertheless argues that the ALJ erred because the ALJ did not make specific "function by function" findings about the mental and physical demands of Plaintiff's past relevant work. (Plaintiff's Amended Statement of Errors, at 13−14.) In support of this assertion, Plaintiff cites to *Baker v. Astrue,* No. 1:11-cv-1096, 2012 WL 4322607, *4 (N.D. Ohio 2012). In that case, an ALJ determined that a claimant could perform his past relevant work as a lubrication technician as the claimant actually performed that work. *Id.* at *4−5. The claimant in that case asserted that the lubrication technician position, as he actually performed it, required him to work more than forty hours per week, entailed exposure to environmental hazards, and involved regular ladder climbing. *Id.* at * 3-5. The ALJ's RFC determination, however, limited the claimant to working forty hours a week, limited the claimant's exposure to environmental hazards, and included a finding that Plaintiff could not climb ladders or be exposed to heights. *Id.* Because the claimant's past duties were inconsistent with the ALJ's RFC determination, substantial evidence did not support the determination that the claimant could perform his past relevant work as he actually performed it. *Id.*

*Baker* differs from this case because the ALJ here found that Plaintiff can perform her past work as it is *generally* performed in the national economy. Substantial evidence, in the form of VE testimony, supports that determination. Moreover, unlike *Baker*, there is no record evidence that Plaintiff's past relevant work required duties that are inconsistent with the restrictions contained in Plaintiff's RFC. Plaintiff testified that she is currently unable to work at her past jobs because they require her to be on her feet or to sit for extended periods and that causes her problems. (R. at 51.) The ALJ determined, however, that Plaintiff did not have sitting and

standing limitations that precludes her from light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), which entails sitting and standing. Thus, Plaintiff's past work is not inconsistent with the ALJ's RFC and her reliance upon *Baker* is misplaced.

Plaintiff also argues that the ALJ erred by failing to fully investigate the mental and physical demands of Plaintiff's past work. (Plaintiff's Amended Statement of Errors, at 13−14.) Specifically, Plaintiff asserts that such an investigation may have revealed that Plaintiff's past positions were composite jobs. (Id. at 14.) Plaintiff further contends that if Plaintiff's jobs were composite, the ALJ would have been precluded from evaluating Plaintiff's past work as it is generally performed in the national economy. (Id. at 14.) In support of this assertion, Plaintiff cites the Program Operations Manual System ("POMS"), a handbook for internal use at the Social Security Administration.[6] POMS provides: "if [the ALJ] can accurately describe the main duties of [past relevant work] only by considering multiple DOT occupations, the claimant may have performed a composite job." POMS DI 25005.020(B). POMS further provides that because a composite job does not have a DOT counterpart, the ALJ should "not evaluate it at the part of step 4 considering work 'as generally performed in the national economy.'" *Id.*

In this case, however, the VE did not testify that any Plaintiff's past relevant work consisted of composite jobs or that any of her positions could only be categorized under multiple DOT codes. (R. at 54.) Instead, the VE testified that Plaintiff's past relevant work was as a customer service representative, a cashier in retail services, and a network analyst. (Id.) The VE then provided a single DOT code for each of these positions. (Id.) Plaintiff's reliance upon this provision of POMS is unavailing.

---

[6] Although POMS has no legal force and is not controlling, it is "nevertheless persuasive." *Davis v. Sec'y of Health and Human Servs.,* 867 F.2d 336, 340 (6th Cir.1989).

Last, Plaintiff complains that the ALJ did not comply with SSR 82-62.  That rule provides that when finding that a claimant has the capacity to perform past relevant work, an ALJ's decision must contain, among other things: (1) a finding of fact as to the individual's RFC; (2) a finding of fact as to the physical and mental demands of the claimant's past work at issue; and (3) a finding of fact that the individual's RFC would permit a return to his or her past work.  1982 WL 31386, at *4.  Here, the ALJ's determination includes these findings.  The ALJ found that Plaintiff could perform a range of light work with restrictions; the ALJ found that Plaintiff's past relevant work positions were sedentary and semi-skilled[7] or sedentary and skilled; and the ALJ found that this "work does not require performance of activities precluded by [Plaintiff's] residual functional capacity."  (R. at 18.)  Accordingly, the Court finds that the ALJ made the requisite findings of fact.

## VII.    CONCLUSION

In sum the Court concludes that substantial evidence supports the ALJ's decision denying benefits. Accordingly, Plaintiff's Statement of Errors is **OVERRULED** and the Commissioner of Social Security's decision is **AFFIRMED**.   The Clerk is **DIRECTED** to enter judgment in favor of Defendant and to terminate this case.

**IT IS SO ORDERED**.

 _/s/ *Elizabeth A. Preston Deavers*__
ELIZABETH A. PRESTON DEAVERS
UNITED STATES MAGISTRATE JUDGE

---

[7] As noted, the VE testified that Plaintiff's past relevant work as a cashier in retail services was generally considered light, but the ALJ mistakenly wrote that this position was sedentary.  (R. at 54, 18.)  Again, because the VE testified that a person with Plaintiff's work history and Plaintiff's RFC could perform this position, the ALJ's mistaken description of this position did not affect the ALJ's determination.  Moreover, Plaintiff does not argue that the ALJ committed reversible error by describing the position as sedentary.